**MARINE CHEVROLET COMPANY, Inc.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. No. 757.

United States District Court
E. D. North Carolina,
Wilmington Division.

April 7, 1958.

Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N. C., for plaintiff.

Julian T. Gaskill, U. S. Atty., Raleigh, N. C., for defendant.

GILLIAM, District Judge.

This action was brought to recover federal income taxes collected for the years ending July 31, 1953, July 31, 1954, and July 31, 1955, amounting to a total of $18,678.91, and was heard without a jury. A clear cut single question is presented: Was the net annual increase in the credit to a repossession reserve account maintained for plaintiff by General Motors Acceptance Corporation properly returned as income by the plaintiff in each of the years involved?

Upon evidence and the stipulations the Court finds these facts:

1. Plaintiff is a corporation organized and existing under the laws of the State of North Carolina and now maintains, and at all times hereinafter mentioned has maintained, its principal office at Jacksonville, Onslow County, North Carolina. Jacksonville, North Carolina, is a military area.

2. This action is brought against the United States of America for the recovery of Internal Revenue taxes for the fiscal years ended July 31, 1953, July 31, 1954, and July 31, 1955, which were collected for the United States of America by the District Director of Internal Revenue for the District of North Carolina.

3. During all years material hereto plaintiff filed its United States Federal Income tax returns on the basis of a fiscal year ended July 31, and in filing such returns and in keeping its books of account plaintiff employed an accrual method of accounting.

4. For the fiscal years ending July 31, 1953, July 31, 1954, and July 31, 1955,

plaintiff timely filed its United States Federal income tax returns with the District Director of Internal Revenue for the District of North Carolina and disclosed thereon net income and income tax liability as follows:

| Fiscal Year Ended | Net Income Per Return | Tax Liability Per Return |
|---|---|---|
| July 31, 1953 | $44,393.05 | $18,676.55 |
| July 31, 1954 | 22,433.78 | 6,730.13 |
| July 31, 1955 | 64,623.79 | 28,104.37 |

5. The tax liability disclosed on these returns was paid by plaintiff to the District Director of Internal Revenue for the District of North Carolina on dates as follows:

| Fiscal Year Ended | Date of Payment | Amount of Payment | Total |
|---|---|---|---|
| July 31, 1953 | October 15, 1953 | $ 7,470.62 | |
| | January 21, 1954 | 7,470.62 | |
| | April 15, 1954 | 1,867.66 | |
| | July 15, 1954 | 1,867.65 | $18,676.55 |
| July 31, 1954 | October 20, 1954 | 3,028.56 | |
| | January 18, 1955 | 3,028.56 | |
| | April 14, 1955 | 336.51 | |
| | July 14, 1955 | 336.50 | 6,730.13 |
| July 31, 1955 | October 25, 1955 | 14,052.19 | |
| | January 16, 1956 | 14,052.18 | 28,104.37 |

6. On October 15, 1956, and within three years after the filing of each of the United States Federal income tax returns for the fiscal years ending July 31, 1953, July 31, 1954, and July 31, 1955, plaintiff timely filed with the Director of Internal Revenue for the District of North Carolina claims for refund of income tax for each of the fiscal years ending July 31, 1953, July 31, 1954, and July 31, 1955. Upon such claims plaintiff requested refunds of income tax for said years in the amount of $4,066.12, $2,862.74, and $11,750.05, respectively.

7. This action was instituted on May 6, 1957, which date is more than six months after such claims for refund were filed, and prior to the institution of this action the Commissioner of Internal Revenue had not notified plaintiff by registered mail of either the allowance or disallowance of said claims.

8. The Court is vested with jurisdiction in this action under Section 1346, Title 28 United States Code.

9. At all times pertinent herein plaintiff has engaged in business in Jacksonville as an authorized automobile dealer for Chevrolet, Oldsmobile and Cadillac cars, and in such business has handled primarily automotive products manufactured and distributed by General Motors Corporation. In its business about seventy percent of plaintiff's customers have been military or civil service personnel. A high percentage of all its business has been with individuals in the lower age group, that is, between 21 and 28.

10. In the ordinary course of its business plaintiff has sold both new and used automobiles on the installment basis, and notes regularly received for these sales have been assigned regularly to the Gen-

eral Motors Acceptance Corporation, hereinafter referred to as GMAC.

11. The acquisition of installment contracts from plaintiff during the taxable years 1953, 1954, and 1955 was handled by GMAC under its retail plan.

12. Under GMAC's retail plan, a finance charge is added to the amount to be collected from the automobile purchaser.

13. At the time of the purchase of a conditional sale contract by GMAC it credits a portion of the finance charge, approximately 20 percent, to an account (hereinafter called dealer's reserve account) in favor of the dealer from whom such contract is purchased.

14. Payments are made by GMAC to dealers from the dealer's reserve account under different plans. Payments are not made to some dealers until the dealer requests that some part of the reserve be made available. Other dealers are paid periodically a portion of the amount credited by GMAC to the particular dealer's reserve account.

15. The dealer's reserve account is debited with a portion of the finance charge which is rebated to a customer when a customer pays a conditional sale contract ahead of schedule. The dealer's reserve account is also debited when payments are made therefrom to the dealer.

16. At the election of GMAC the dealer's reserve account may also be debited for any unpaid liability of the dealer to GMAC.

17. When plaintiff sells an automobile to a purchaser who wishes to pay part of the purchase price in installments and the installment paper is to be assigned by plaintiff to GMAC, the purchaser and plaintiff execute a conditional sale contract upon a form furnished by GMAC, and this contract is forwarded by plaintiff to GMAC for acceptance or rejection.

18. The contract so executed and forwarded sets forth the unpaid cash balance, insurance charges and the amount of the finance charge, the total of which constitutes the time balance.

19. As a prerequisite to acceptance of a conditional sale contract by GMAC plaintiff must execute an assignment and guaranty under the terms of which plaintiff unconditionally guarantees payment of the full amount of the contract and covenants if default be made in any payment due thereon to reimburse GMAC for the full amount of the unpaid balance due on the contract. GMAC will not purchase a contract unless the plaintiff's recommendation, assignment and guaranty is properly signed and executed by an official of the plaintiff.

20. If a conditional sale contract is accepted by GMAC it forwards plaintiff a check for the net proceeds of the contract, which is the cash selling price less the down payment.

21. After a contract is assigned to and accepted by GMAC it collects the installment payments and in the event of default by the purchaser of the automobile GMAC enforces responsibility against plaintiff in accordance with plaintiff's guaranty. This means that in the normal case GMAC repossesses the automobile from the defaulting purchaser and returns it to plaintiff. For its part plaintiff upon return of the car remits to GMAC the unpaid balance due under the conditional sale contract.

22. The dealer's reserve account in plaintiff's name on GMAC's books is controlled by GMAC. The amounts credited to the account are not available to plaintiff until GMAC elects to make payments therefrom.

23. GMAC will make no payment from the dealer's reserve account until it has considered the plaintiff's contingent liability on all conditional sales contracts assigned by plaintiff to GMAC. GMAC, prior to making payment, also considers the quality of the paper, the performance of the paper and the type of individual purchasers of cars primarily responsible under the conditional sales contracts.

24. GMAC makes payments to plaintiff of amounts credited to the dealer's reserve account only when it considers

that the balance in the dealer's reserve account exceeds the amount required for its protection against loss on the conditional sales contracts acquired from plaintiff and for which plaintiff is contingently liable in event of default.

25. Approximately seventy percent of plaintiff's business was with military and civil service personnel attached to the Jacksonville Marine base. Plaintiff has many losses on its contracts and both plaintiff and GMAC consider the conditional sales contracts of military personnel more hazardous than average paper.

26. On plaintiff's books the dealer's reserve account was called "Repossession Reserve" account.

27. On its United States Federal income tax returns for the fiscal years ended July 31, 1953, July 31, 1954, and July 31, 1955, plaintiff reported as "Other Income" the amount of the increase in the account entitled "Repossession Reserve" on its books for each of the aforementioned years. The amounts so reported were as follows:

| Fiscal Year Ended | Amount Reported Per Return as Other Income |
|---|---|
| July 31, 1953 | $ 8,318.58 |
| July 31, 1954 | 10,151.55 |
| July 31, 1955 | 24,038.57* |

*Although this is amount reported Exhibit P-11 shows increase in Repossession Reserve account of $24,013.57 for fiscal year 1955.

28. The Repossession Reserve account was shown on plaintiff's balance sheets for fiscal years ended July 31, 1953, July 31, 1954, and July 31, 1955, as follows:

| Fiscal Year Ended | Designation on Balance Sheet | Amount |
|---|---|---|
| July 31, 1953 | Accrued Commissions | $13,998.04 |
| July 31, 1954 | Accrued Commissions | 23,402.03 |
| July 31, 1955 | Dealer's Reserve | 33,041.02 |

29. The accumulated credits in the dealer's reserve account in plaintiff's name on GMAC's books, the amount of plaintiff's contingent liability on outstanding conditional sales contracts assigned to GMAC, and the percentage of the reserve to the contingent liability were as follows:

| Date | Balance in Plaintiff's Dealer's Reserve Account | Amount of Plaintiff's Contingent Liability | Percent of Reserve of Contingent Liability |
|---|---|---|---|
| August, 1951 | $ 7,488. | $ 178,000. | 4.21 |
| August, 1952 | 11,986. | 182,000. | 6.59 |
| August, 1953 | 20,495. | 350,000. | 5.85 |
| August, 1954 | 30,755. | 455,000. | 6.76 |
| August, 1955 | 55,252. | 894,000. | 6.18 |
| August, 1956 | 63,394. | 1,050,000. | 6.04 |

30. In November of 1950 GMAC tendered a payment to plaintiff of a portion of the amount credited to it in GMAC's dealer's reserve account. The amount tendered by check was $3,800, but the check was returned by the plaintiff with

a request that the funds be credited back to its account. The amount was returned by plaintiff in order to build up a reserve account as protection against potential losses.

31. In November of 1950 plaintiff's contingent liability to GMAC was $172,-000 and the accumulated credit in the dealer's reserve acount in plaintiff's name on GMAC's books was $9,306, or 5.41% of the contingent liability.

32. In July of 1951 GMAC made a payment of $5,000 to plaintiff and debited the dealer's reserve account in plaintiff's name by that amount. This payment reduced the credit in the dealer's reserve account in plaintiff's name to approximately four percent of plaintiff's contingent liability.

33. Between 1951 and 1956 no payments were made by GMAC to plaintiff which affected the credit in the dealer's reserve account in plaintiff's name on GMAC's books. Subsequent to July of 1951 until the latter part of July, 1956, the plaintiff did not request the payment of any amounts out of the dealer's reserve account in its name on GMAC's books and no withdrawals were made.

34. After July, 1951, the next payment by GMAC to plaintiff from the dealer's reserve account in plaintiff's name was in the amount of $19,450 in July of 1956. This payment was made pursuant to plaintiff's request. In making this payment in 1956 GMAC retained approximately six percent of plaintiff's contingent liability as a credit in the dealer's reserve account in plaintiff's name on GMAC's books.

35. Generally GMAC retains a minimum of three percent of a dealer's contingent liability as a credit in the dealer's reserve account in a dealer's name. At least that amount of credit must be accumulated before GMAC considers any reserve amount as being earned and payable. In some cases GMAC might require that less than three percent remain as a credit in the dealer's reserve account, but in many cases more than three percent is required as a minimum credit in such account.

36. GMAC could have retained 100 percent of the credit in the dealer's reserve account in plaintiff's name on GMAC's books if GMAC had so desired. In plaintiff's case GMAC would have retained as an accumulated credit in plaintiff's dealer's reserve account an amount in excess of three percent of plaintiff's contingent liability. This amount in excess of three percent would have been required based upon GMAC's observation and knowledge of the hazardous type of risk involved in the conditional sales contracts assigned to it by plaintiff.

37. The right to receive the amounts in the dealer's reserve account in plaintiff's name on GMAC's books was not fixed in any of the taxable years 1953, 1954 and 1955.

38. The net annual increase in the credit to a dealer's reserve account maintained for plaintiff by GMAC, an automobile finance company, was not properly returned as income by plaintiff, an accrual basis taxpayer, in each of the years ended July 31, 1953, July 31, 1954, and July 31, 1955.

Upon the foregoing facts the Court concludes that the annual increase in the credit to the reserve account was improperly returned by plaintiff as income and that plaintiff should recover in accord with its demand.

It is contended by plaintiff that the decision in Johnson v. Commissioner, 4 Cir., 233 F.2d 952 settles the question in its favor and with this position I agree. The efforts of the defendant to point out a substantial distinction between the Johnson case and this case are not persuasive. In Long Poultry Farms, Inc., v. Commissioner, 4 Cir., 249 F.2d 726, 730, decided November 8, 1957, this Circuit reviewed and approved the position taken in the Johnson case, quoting as follows from the opinion in that case: "The general principles which must control our decision have been authoritatively stated by the Supreme Court. It is 'the right to receive and not the actual receipt' of an amount which determines its accruability. 'When the right to receive an amount becomes fixed, the right accrues.'

Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 185, 54 S.Ct. 644, 645, 78 L.Ed. 1200. Until the right to an amount becomes accruable through fixation of the right to receive, the taxpayer is under no obligation to return it as income. Otherwise, he would be required to pay a tax on income which he might never have a right to receive."

Several other decisions in point have been cited by the plaintiff, but there appears to be no good reason to deal with them as the Johnson case seems to me to end the argument in plaintiff's favor.

Plaintiff will present a formal judgment.